LEE R. KINCAID et ux.

*v.*

BARBARA M. ALDERSON and COMMERCIAL CREDIT
CORPORATION.

354 S. W. 2d 775.

(*Nashville,* December Term, 1961.)

Opinion filed March 7, 1962.

598

JAMES O. NOLAND, Clarksville, for appellants.

EUGENE F. TORO, Providence, R. I., for appellees.

Mr. Justice Burnett delivered the opinion of the Court.

The bill in this cause was filed by the appellants to clear their title to a mobile home, which had been purchased by the appellants under circumstances of a contract hereinafter set out. The bill was demurred to on various grounds. The Chancellor sustained the second ground of the demurrer, which was that neither of two conditions, which were set out in the title bond given the appellants, had been performed. The Kincaids have appealed and assigned error. The propositions presented present a number of facets and, in view of their interest to the writer of this opinion, he has spent several days in an independent investigation before arriving at a conclusion hereinafter set forth.

In 1958, Clayton L. Alderson and his wife, Barbara M. Alderson, purchased a mobile home in Wichita Falls, Texas. At the time of this purchase they executed a chattel mortgage on said mobile home to the Commercial Credit Corporation to secure a note, payable to said corporation, in the sum of $6,439.20, which was payable in monthly installments of $107.32 over a period of five years. The amount of these payments included premiums on a life insurance policy issued to Commercial Credit on the life of Clayton Alderson, the maker of the note. This life insurance was payable to the credit corporation in the event Alderson died prior to the payment date of said note.

In January, 1960, the Kincaids purchased this mobile home from Alderson for ''$600.00 in cash upon the execu-

tion of this obligation and the balance of said purchase price shall be paid by the parties of the second part assuming and agreeing to pay the balance due the Commercial Credit Corporation, of Wichita Falls, Texas, on a note executed by the parties of the first part and which is secured by purchase money chattel mortgage of the above described mobile home." At the time of the purchase the balance due on said note was $4,892.80. In September, 1960, following this purchase by the Kincaids, Clayton Alderson was killed in Germany. In due course the insurance company paid the balance due on said note to the Commercial Credit Corporation.

The contention of the Kincaids is that by the payment of this note by the insurance company to the Commercial Credit Corporation, that they are thus entitled to this payment by the insurance company of this note and that the widow, the administrator of the estate of Clayton Alderson, should execute to them a bill of sale for said home, and that they should be relieved of the payment of the balance of this note since it had been paid off by the life insurance on Clayton Alderson.

The title bond issued by the Aldersons to the Kincaids provides:

"When the parties of the second part shall have paid in full the amount due the Commercial Credit Corporation and said purchase money chattel mortgage is cancelled, or when said parties of the second part shall have reduced the amount due the Commercial Credit Corporation whereby they can refinance the mobile home in their own name, said parties of the first part make, execute and deliver unto the said parties of the second part or their assigns a good and sufficient bill of sale

and title for said mobile home, and thereby transfer all of said parties of the first part interest to parties of the second part with general warranty and free from encumbrances.''

Obviously, from the quotation above one or two words are left out of this, but the sense of the provisions of the transfer is plain nevertheless.

■ It is first to be observed that the contract between the Aldersons and the Kincaids is nothing more than an old-fashioned title bond. Such a bond gives the holder, that is the Kincaids, an equitable title, converted into a legal title, upon the payment of the consideration. Thus it is that the Kincaids contend that since the mortgage has been paid in the way above indicated Mrs. Alderson, the administrator of the estate of her deceased husband, should execute to them a clear title, or that it be done through the court.

The original bill praying, as it did, to clear the title had filed as exhibits thereto, the original contract or title bond, as well as certain portions of the insurance contract, and the chattel mortgage executed by the Aldersons to the Commercial Credit Corporation.

This contract of life insurance on Alderson taken out by his creditor, Commercial Credit Corporation, provides when the obligation of Alderson to Commercial Credit is paid including any premiums that they have to pay, etc., that any balance left over will be paid to Alderson. In other words, the life insurance policy merely covers any and all obligations of the creditor under this chattel mortgage.

■■ A number of questions are raised as to whether or not there is an insurable interest herein in the person on whose life this life insurance was written. "As a general rule, it has been stated that insurable interest exists only if the beneficiary has some interest, or has a reasonable expectation of advantage, from the continuance of the insured's life, or would lose by his death." Appleman on Insurance Law & Practice, Vol 2, sec. 762, p. 88.

"Subject to any contrary statutory or contract provisions, a creditor has an insurable interest in the life of his debtor, and may be made the beneficiary in a regular life insurance policy upon the debtor's life, so as to entitle him to the proceeds of such insurance, at least, to the amount of his debt, including interest, and the cost of insurance with interest thereon, during the period of life expectancy of the insured according to the Carlisle Tables, or money paid by the creditor for funeral expenses of the debtor in accordance with an agreement made with the insured before his death." Couch on Insurance, Vol. 3, sec. 24:154, p. 266.

■■ Under this quotation the case of *Moneymaker v. Calloway*, 9 Tenn.App. 348, is cited along with decisions from many other jurisdictions in the United States. This is unquestionably the general rule and is the rule applicable in this State. Here under the allegations of the bill and exhibits attached thereto, the Commercial Credit Corporation as a creditor of Alderson had an insurable interest in Alderson's life, and thus as between the Commercial Credit Corporation and Alderson the

insurance was valid and the payment of it to the Commercial Credit Corporation is not contested in any way. Contention is made in this case though that the Kincaids had an insurable interest in the life of Alderson by reason of their assumption of the contract and that thus this payment of the life insurance on the death of Alderson should inure to their benefit. The Kincaids though under a fair and applicable definition of insurable interests, as above quoted, do not have such an interest in the life of Alderson.

The argument is likewise made that since the Kincaids and Aldersons were joint obligators on the debt to the Commercial Credit Corporation that they have an insurable interest in the lives of each other, at least, to the extent of the suretyship of the debt, and as authority for such a statement the case which arose in Tennessee of *International Life Ins. Co. v. Carroll,* 17 F.2d 42, 50 A.L.R. 362, might be cited as an authority. This case though does not come within the facts of the present case. In the International Life Insurance case three partners were equally liable on certain notes and they each had an interest in seeing that these notes were paid off, thus it was held that they had an insurable interest in the life of each obligator on the note. Here we do not have such a situation for reasons immediately to be stated.

When the Kincaids assumed the mortgage indebtedness of the Aldersons on this mobile home they, that is the Kincaids, became primarily liable to the mortgagee, owner of the debt, and the Aldersons then occupied the legal status of a surety. *Fulmer v. Goldfarb,* 171 Tenn.

218, 101 S.W.2d 1108; *Title Guaranty & Trust Co. v. Bushnell,* 143 Tenn. 681, 228 S.W. 699, 12 A.L.R. 1512; *Merrimon v. Parkey,* 136 Tenn. 645, 191 S.W. 327, and many others. This proposition is annotated in 21 A.L.R. 439, wherein it is shown that most of the jurisdictions in the United States, including Tennessee, have adopted this proposition. In other words the Kincaids now become personally liable for the debt.

When the Kincaids assumed payment of this debt they became the principal debtor and the Aldersons became the surety for the debt. *Stone's River National Bank v. Walter,* 104 Tenn. 11, 55 S.W. 301; *Sully v. Childress,* 106 Tenn. 109, 60 S.W. 499, and many others. By these undertakings the successive grantees form a chain of liabilities for the payment of the mortgage debt, the last grantee being the principal debtor and the others surety. See likewise *Wright v. Bank of Chattanooga,* 166 Tenn. 4, 57 S.W.2d 800. An annotation on this subject is in 21 A.L.R., page 504, wherein cases from many jurisdictions are cited to support the proposition. Thus it is that the Aldersons after this obligation had been assumed by the Kincaids are merely sureties and Kincaid is the principal debtor. In other words the Commercial Credit Corporation would have had an insurable interest in the Kincaids as well as the Aldersons because they both, the Kincaids primarily and the Aldersons now secondarily, were liable for this obligation.

When thus a surety by his death through a valid life insurance policy on his life has discharged the obligation, this does not discharge the obligation of the Kincaids who are primarily liable. It would be exactly the

same situation as if a surety on an obligation for any reason decided to pay off the obligation. This would not release the principal debtor from his obligation, but it would then be transferred to the surety who had discharged the obligation to release himself as surety. Thus by the death of Alderson and his life insurance paying this debt it would merely transfer the debt of the principal obligator to the surety rather than to the creditor. When the debt is thus paid the surety subrogated to the rights of the creditor. *Willis v. Davis,* 3 Minn. 1. This payment constitutes "an unjust enrichment of the principal" who must "reimburse the surety to the extent of the enrichment." Restatement of the Law, Security, sec. 104. Comment on Subsection (2), page 279. The contract herein, quoted from extensively, makes no provision to the contrary but by the plain wording of this contract the Aldersons or their heirs agree when this obligation is discharged, or put in a position where it can be refinanced, then they will convey good title. There is nothing in this contract which would indicate that if Alderson dies and the debt is paid through this insurance that it would relieve the principal obligator.

From our investigation of the authorities over the United States the nearest case, and the only one anywhere near the factual situation herein that can be found, is that of *Moneymaker v. Calloway,* supra. In this case, that is the Moneymaker case, the Court of Appeals held that there was no objection to the validity of a contract of life insurance because it might redound to the interest of a security who has no insurable interest in the insured. The court though in this case, that is the Moneymaker case, had before it an entirely different situation than

here. The court had this to say, which is probably dictum but nevertheless the second principle stated in this dictum, is an applicable legal principle which certainly applies under the factual situation in this case. After agreeing that the benefit of this life insurance did redound to Mrs. Calloway who had no insurable interest, the court says this:

"If the administrator of the estate of Andrew H. Moneymaker has any claim to this money, he must work it out in one of two ways. First, he may lay claim to the car the money went to purchase, but he has abandoned this claim in this court; and, second, he may claim his intestate was secondarily, and not primarily, liable for the debt, and since his intestate paid the debt he is entitled to recover it from Lucy Calloway, for the reason she was primarily liable for the debt."

In other words the court was correctly saying that if life insurance on a party had redounded to someone who had no insurable interest, yet it was written as it was herein to cover a creditor, if then that person to whom it had redounded was primarily liable for the debt that the surety, as the Aldersons were herein, would have a right of action over against the person primarily liable for this debt, as were the Kincaids in the present instance.

Argument is likewise made herein in behalf of the Kincaids that by this contract, assuming and agreeing to pay for this, that it amounted to an assignment of the Aldersons to the Kincaids of this life insurance on Alderson's life. This is an incorrect assumption because the Aldersons had nothing to assign. The life insurance

was written for the benefit of the Commercial Credit Corporation. They were the beneficiaries of the insurance on Alderson, and Alderson had nothing to assign and by any contract that he made he couldn't make such an assignment.

After a full and thorough consideration of the entire case, we are well satisfied that the Chancellor reached the correct conclusion in that the Aldersons would not be forced to execute a title because the terms of the contract had not been met for reason of what is hereinabove set forth. The decree below must be affirmed.